[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
The parties are before this court for a dissolution of their eighteen (18) year marriage. They are the parents of three (3) children — John, now thirteen (13), Eileen, now eleven (11), and Timothy, now eight (8) years old. The plaintiff wife is forty-two (42) and the defendant husband is forty-four (44); both enjoy good health. The issues for determination are financial and that of property distribution, the couple — to their credit — having agreed on all child related CT Page 11387 issues. Testimony was taken over three (3) days and both parties were effectively represented by counsel. Both parties testified and the court observed their demeanor and evaluated their credibility. Real estate appraisers testified and numerous exhibits, all of which the court has examined, were offered. Each party submitted a sworn financial affidavit and written claims for relief. Each party has successfully completed the Parenting Education Program.
The couple married on April 30, 1983. She is a high school graduate presently employed full-time as a dental assistant and part-time as a receptionist for a real estate agency. Her gross yearly income from both jobs is approximately $25,500; she nets approximately $380 per week. Though capable of employment more financially rewarding, she is presently without the education, skills, or training to find such work — primarily because she and the defendant agreed her primary role was to be that of homemaker and primary caretaker for the family so that he could pursue his career objectives. He has a B.S. from the United States Merchant Marine Academy and is, by training, a professional engineer. For the first four (4) years of the marriage, he was away sailing for approximately half (1/2) the year. In 1987, he began working for the Department of Defense as an Assistant Nuclear Test Engineer at the Portsmouth Naval Shipyard in New Hampshire. Since April of 1994, he has been employed by the City of Bridgeport as Deputy Director of Park Facilities where his yearly salary is approximately $75,000; he is also provided a car for both business and personal use, for which all car expenses are paid. That benefit considered, he earns approximately $80,000 per year. His net weekly salary is $1,123.
The court finds there are three (3) marital properties as follows:
1. 37 Glen Avenue, Midland Park, New Jersey
 The husband bought this property a little more than one year before the marriage (but after their engagement to marry) He paid $74,000; there was a first mortgage of $65,000 and a second mortgage of $2,000 from the seller. The down payment came from his savings, and he has paid off the second mortgage. There are two (2) rents on the property. Over the years, the property has been refinanced at least three (3) times; money obtained from those refinances was used to pay off existing mortgages, to purchase other properties, and/or to maintain or improve or repair existing properties. Frequently, marital assets were used to accomplish such undertakings. The husband's testimony was that its CT Page 11388 present value is $268,000 and that the present mortgage balance is $82,230. Equity interest is therefore $185,770. His financial affidavit of August 1, 2001, lists gross weekly income from the property at $358 — or $28,616 yearly. Weekly expenses are stated to be in the same amount though no supporting documentation was offered. The court rejects the suggestion this rental property is not profitable. The mortgage is current.
 Vis-a-vis this property, it is relevant to this court that, for the first four (4) years of the marriage when the husband was away sailing for half (1/2) the year, the wife kept the property going. The family lived on the first floor and there was a tenant on the second floor. When purchased, the house required extensive work — i.e., the erection of walls, the moving of support beams, and extensive repairs to the kitchen and bedrooms. While he sailed, the house he left behind was in various — sometimes egregious — states of disrepair and/or construction (He accomplished most of the repairs himself.). Despite living conditions many would not have tolerated, she remained there alone, collected the rent, kept the second floor occupied, arranged for emergency repairs, paid the bills, etc. (He always deposited his paycheck into a joint checking account.). She was then also working through a temporary agency during the periods he sailed.
 Though the husband appeared both pleasant and credible, there was testimony persuasive of the fact he never considered this to be a marriage of equals nor a true partnership. Likewise, he has not always been honest in his dealings with the wife nor has he been respectful of her contributions or abilities. He did not deny he had on occasion told her not to "think" because she was not "capable" of thinking. The facts surrounding his ownership of this property are particularly telling. Having purchased the property pre-marriage, he was the sole legal owner. Once married, the wife repeatedly requested she be made a co-owner and her name put on the deed (not unreasonable in view of her contributions and the conditions under which she CT Page 11389 then lived). In response to those repeated requests, he arranged for her a meeting with a lawyer and told her it was to effect co-ownership of the property. In fact, the legal paper signed that day was the mortgage note which she, a seemingly intelligent but obviously too unsophisticated and trusting a woman, signed without reading. Thus, she has no legal interest in the property but is liable on the note. Despite the passing of many years and multiple refinances, she is still not on the mortgage deed (Nor did he even address this fact in his trial testimony.). His failure to remedy this inequity is indicative of a character flaw which taints his otherwise pleasant manner.
 The defendant began stateside employment in 1987, and the couple moved to New Hampshire where they bought a home together (The New Jersey property has always been kept and maintained as a two-family rental.). He worked as a nuclear test engineer and she worked part-time as a teacher's aide. The first child was born in 1988 and the second child arrived in 1990. In 1991, while the husband was at work over an hour from home, the house burned down. The wife and two children, both under three (3), were at home but unharmed. The couple next rented a home in Maine (fifteen [15] minutes from the husband's job in New Hampshire) until May of 1992. Their homeowner's policy paid off the mortgage on the New Hampshire house and left them approximately $20,000. There remained the land on which the house was located and a shed untouched by the fire, both of which were sold in 1993 for $22,000. The couple then relocated to Connecticut and purchased the second marital property at issue.
2. 110 Millbrook Terrace, Monroe, Connecticut
 Both are legal owners of this property, the marital residence from May of 1992 until the husband moved out in April of 2001. It is a large ranch with four (4) bedrooms and two and one-half (2 1/2) baths. Purchased for $230,000, they took a mortgage for $125,000. The down payment came from some of the proceeds from the New Hampshire property, $10,000 CT Page 11390 from an IRA the husband had before the marriage, and a $10,000 loan from the husband's parents. As had now become the couple's way of financing home improvements, purchasing new furniture, or paying off credit card debt, they have refinanced this home at least three (3) times also. There remains yet a first and second mortgage in the total amount of $111,534. At trial, one appraiser found its fair market value to be $280,000; a second appraiser found its fair market value to be $330,000. Each based his/her appraisal primarily on the comparative sales approach. The court finds the fair market value to be $330,000 and rejects the first appraisal as based on "old" comparison sales not reflective of the current real estate market as well as on the fact the first (lesser) appraisal included a value adjustment for necessary repairs in the approximate amount of $40,000 without attaching to the report a copy of the repair estimate or documenting such estimate at trial. Relevant perhaps is that the second appraiser was effectively denied access to the interior of the home by virtue of the wife's failure to timely respond to that appraiser's request. The present equity in this property is therefore $218,466. Though repairs need to be made, the court cannot assess the extent of the same for the above stated reasons.
3. 372-376 Purdy Hill Road, Monroe, Connecticut
 This is a rental property held solely in the husband's name and purchased in March of 2001 with marital monies. The purchase price was $265,000. The defendant's parents allegedly contributed $27,500 toward the first mortgage and the defendant took a second mortgage of $26,500 ($12,500 of which he testified was contributed by a female friend in a barter transaction).[1] The property consists of three (3) rental units. The husband occupies the front unit which has three (3) bedrooms and is sufficiently spacious to permit comfortable accommodations when the children are with their father. The second — or rear — unit of the main structure is not presently rented nor is an additional structure to the side of the house CT Page 11391 though both are income producing. The defendant is doing most of the repairs; he offered no plausible reason for the delay in readying these rental units for occupancy and there was no evidence of the rental potential. It is, however, clear the husband's income will increase once he attaches a priority to their occupancy as should the fair market value of the property and, thus, the equity interest. The present mortgage balance is $238,500; the present equity is $26,500.
The husband argues the marital home be held in both partners' names as tenants in common and that the wife and children continue to reside there until the youngest child is nineteen (19) or graduates from high school, the plaintiff remarries or cohabits, or the plaintiff earlier decides to sell — whichever first occurs. He proposes that, for so long as she resides there, she be fully responsible for the first and second mortgages and all ongoing expenses and that, upon the first of the aforementioned contingencies, the house be sold with each party sharing equally in the net proceeds. This suggestion ignores the reality of the parties' priorities and methods of handling matters as well as it ignores the certitude of life's vicissitudes. The couple now seriously disagree on the extent, kind, and cost of repairs required.[2] Additionally, she is presently unable to financially contribute to such repairs and it is therefore likely the husband will be required to effectuate the repairs himself and will assert a credit at the time of sale. There is no reason to believe he will attach the same urgency to these repairs as will the wife who, together with their children, resides in the home and that will only be aggravated by the fact his attention will now be turned to readying the rental units on Purdy Hill Road for occupancy so as to maximize that property's income potential. Finally, should one or both parties develop significant relationships with other partners, the number of other persons participating" in decisions regarding such matters as repairs and improvements will grow. The bottom line is that the dissolution will not alter their personal priorities nor will it ameliorate the significant communicative difficulties they now experience.
A recurrent problem throughout the marriage has been high credit card debt. Whether that is as a result of the wife's always having been a poor money manager (He testified he used personal savings to pay off — prior to the marriage — $5,000 she owed on credit cards.) or whether it is as a result of her having become accustomed to his making twice as much money when he was sailing than he made for many years thereafter, it is clear it is she — not he — who is the spender and that she has had limited potential to contribute to the family's financial CT Page 11392 health. While he was making home repairs in order to save money (and seldom to his wife's timetable or quality standards), she continued a level of spending beyond their means and thus the frequent refinances never permitted them to pay down the principal on their mortgage debt. Though there was no evidence the plaintiff spent on herself, the ineluctable conclusion is that she was never fully cognizant of the relationship between their debt level and her credit card use. Nor is the defendant wholly at fault since, though aware of her credit habits, it was not until shortly before he left the marital home that he assumed full responsibility for the finances and took upon himself the payment of household bills. Thus, his failure to seize control encouraged his wife's belief there would always be another refinance to address the debt level.
Though each has accused the other of an extramarital relationship which contributed to the cause of the breakdown, neither sustained his/her burden of proof in that regard. The court finds the cause of the breakdown to be each party's inability to effectively communicate his/her needs to the other and/or the inability to address those needs as a result of differing priorities. Though each loves the children, their parenting styles differ. She views parenting as a "hands on" process requiring emotional commitment. He embraces a more traditional approach of the male as head of household whose primary responsibility is to be the breadwinner. It is therefore not surprising that his priority has been his career and his opportunity to increase earnings and that he would eschew the wife's frequent requests that, during the summer months, he come home from work early on Friday to spend the late afternoons and evenings with the family under relaxed circumstances. Perhaps the wife summed up the cause of the breakdown best when she testified to her belief they were "not a good match." What is evident is that neither is any longer willing to — if indeed they are capable of — committing to the level and consistency of effort required to ensure that commonality of interest requisite to a healthy marriage.
In formulating proper orders in this case, the court must consider the factors set forth in Connecticut General Statutes §§ 46b-81, 46b-82, and 46b-84, together with the provisions of § 46b-62 regarding attorney's fees. The court has considered all of these factors in making its determinations and has considered all of the evidence, the parties' demeanor and credibility, their financial affidavits, claims for relief, memoranda of law, and all of the applicable case law. Since "[i]t would serve no useful function to require the trial court ritualistically to rehearse the statutory criteria that it has taken into account," Scherrv. Scherr, 183 Conn. 366, 368 (1981), this court will not recount those statutory criteria and the evidence other than as has been previously stated. "The court is not obligated to make express findings on each of CT Page 11393 these statutory criteria." Weiman v. Weiman, 188 Conn. 232, 234 (1982). The court must consider all the statutory criteria in determining how to divide the parties' property in a dissolution proceeding. Lee v. Lee,197 Conn. 1, 5 (1985); it need not give equal weight to each factor. Kanev. Parry, 24 Conn. App. 307, 313-14 (1991)
With specific regard to property assignment and what alimony award, if any, is appropriate, the court is mindful our alimony statute does not recognize an absolute right to alimony. General Statute § 46b-82;Thomas v. Thomas, 159 Conn. 477, 487 (1970). As to alimony, it has been said, "The primary basis for the award of alimony has been not to punish . . . but to continue the duty to support the other. . . ." Toby v.Toby, 165 Conn. 742, 748 (1974). In making financial determinations, the financial circumstances, both actual and potential, are entitled to great weight. Valente v. Valente, 180 Conn. 528, 530 (1980). In Blake v.Blake, 207 Conn. 217, 230 (1988), our Supreme Court cited with approval the language of O'Neill v. O'Neill, 13 Conn. App. 300, 311 (1988) regarding property division as follows:
 A property division ought to accord value to those nonmonetary contributions of one spouse which enable the other spouse to devote substantial efforts to paid employment which, in turn, enables the family to acquire tangible marital assets. The investment of human capital in homemaking has worth and should be evaluated in a property division incident to a dissolution of marriage. We hold, accordingly, that an equitable distribution of property should take into consideration the plaintiff's contributions to the marriage, including homemaking activities. . . . See also Watson v. Watson, 221 Conn. 698, 712 (1992).
The court has considered the issue of counsel fees as requested by the wife. Such fees are allowable under the provisions of § 46b-62 of the General Statutes. The wife's counsel has submitted an affidavit regarding financial services (plaintiff's exhibit C) and he has agreed to compromise to $15,000 the amount due and owing. The wife has no liquid funds from which to pay this amount. The husband has significantly greater earning power, assets to sell (i.e., a motorcycle), and he offered no evidence his attorney's fees remain unsatisfied (Though his financial affidavit states there is an outstanding balance of $7,000 as of August 1, 2001, no evidence of the same was offered, no affidavit of services was offered by his counsel, and no claim for relief regarding the same was proffered.).
The court makes the following findings: CT Page 11394
 1. There is jurisdiction over the marriage and the wife has proven the allegations of her complaint.
2. The marriage has broken down irretrievably.
3. Both parties have contributed to the cause of the breakdown.
The following orders shall enter:
 1. A judgment of dissolution enters on the wife's complaint on the grounds of irretrievable breakdown.
 2. The parties shall share joint legal custody of the three (3) minor children. Physical custody shall be with the plaintiff wife and the defendant husband shall have reasonable, liberal, and flexible rights of visitation and a sharing of holiday and vacation periods. The court approves the recommendations of the Attorney for the Minor Children as embodied in the Parenting Plan attached hereto as Schedule A, incorporates it by reference in this Judgment, and makes it an Order of the court.
 3. The defendant shall pay to the plaintiff child support in the amount of $350 per week in accord with this state's Child Support Guidelines.
 4. The defendant shall provide medical, dental, and orthodontic insurance for the benefit of the minor children so long as it is available through his employment. If such is no longer available to him through his employment, the wife shall maintain the same if available to her through her employment. If medical insurance shall not be available to either through employment, they shall share equally in the cost of providing the same. Regardless of which parent provides coverage, each will share equally in the cost of all unreimbursed/uninsured medical, dental, and orthodontic expenses for the minor children in accord with the Guidelines. The plaintiff wife may avail herself of her COBRA benefits at her expense.
 5. The parties shall, in accord with the Guidelines, CT Page 11395 share equally all day care expenses incurred as a result of the plaintiff's employment.
 6. The defendant will pay to the plaintiff the sum of $250 per week as alimony for a period of five (5) years from the date of judgment, the wife's remarriage, or her cohabitation, whichever first occurs. Thereafter, the defendant will pay to the plaintiff as alimony the sum of $150 per week for three (3) years, which obligation shall earlier terminate in the event of the wife's remarriage or cohabitation, whichever first occurs.
 7. The defendant's obligations to pay child support and alimony shall be secured by way of a contingent wage withholding.
 8. The defendant shall maintain life insurance in the amount of $200,000 for the benefit of the minor children for so long as he has an obligation to pay child support. The wife shall be named as trustee and the children shall be named as irrevocable beneficiaries during the period of their minority. The defendant shall yearly provide the wife proof of compliance with this Order.
 9. The parties shall share equally any tuition costs incurred for the children during their minority. The incurring of such tuition costs in any school year shall require the consent of both parties.
 10. The defendant shall retain his ownership of the real property located in Midland Park, New Jersey, and at 372-376 Purdy Hill Road in Monroe, Connecticut, and he shall be fully responsible for all financial obligations incident to such ownership and save harmless the plaintiff from any and all claims and liabilities with respect thereto from this date forward. He shall, within forty-five (45) days of this date, obtain a full release of the plaintiff on any mortgage note applicable to these properties and he shall furnish the plaintiff a copy of said release(s) within fifteen (15) days of the release(s). The defendant shall be entitled to retain all rental income and to claim any appropriate tax deductions CT Page 11396 without claim or demand by the plaintiff from this date forward. He shall not, between this date and the date he obtains the release(s), further encumber the property in any way.
 11. The defendant shall, within thirty (30) days of this date, make current all mortgage payments, property taxes, and homeowners' insurance payments as well as satisfy any outstanding tax liens on the property located at 110 Millbrook Terrace in Monroe, Connecticut. He shall provide the plaintiff proof of timely compliance with the above immediately thereafter and, within fifteen (15) days orf such compliance, he shall quitclaim all of his right, title and interest in that property to the plaintiff who shall thereafter be financially responsible for any and all obligations incident to her ownership and save harmless the defendant from any claims or liabilities arising from her ownership of that property.
 The defendant shall not place any encumbrance on said property as of this date — whether voluntary or involuntary. Should there be any such encumbrance placed upon the property as a result of any direct or indirect action of the defendant, he shall be solely responsible for all such obligations — to include but not be limited to late charges, fees, costs, and/or penalties incurred to remove the same.
 12. The defendant shall retain all interest in his Fidelity IRA and his pension with the City of Bridgeport free and clear of any claim or demand by the plaintiff. His interest in his American National account and his Nationwide Retirement account shall be valued as of this date and each shall be divided equally between the parties, such one-half (1/2) interest to be transferred to the plaintiff-wife by a Qualified Domestic Relations Order prepared by the defendant's counsel at the expense of the defendant.
 13. The defendant shall transfer to the plaintiff all of his right, title, and interest in the 1989 CT Page 11397 Volvo and the same shall be her property free and clear of any claim or demand by the defendant. She shall be fully financially responsible for the same and shall indemnify and save harmless the defendant from any claims or liabilities arising out of her ownership of said vehicle.
 14. The 1968 Chevy Nova and the motorcycle shall be the sole and separate property of the defendant and he shall indemnify and save harmless the plaintiff from any claims or liabilities arising out of his ownership of those vehicles.
 15. Each party shall retain those checking and/or savings accounts as appear on his/her financial affidavits of August 1, 2001, and August 6, 2001, respectively, free and clear of any claim or demand by the other.
 16. Any monies held by Veronica Reich, Esq., from the parties' 1999 federal tax return shall be paid to Janis M. Laliberte, Esq., as Attorney for the Minor Children. Should any amount remain, it shall be the property of the defendant. Any balance which may yet be due and owing Attorney Laliberte shall be borne equally by the parties.
 17. Beginning in 2001 and each year thereafter, the parties shall each claim one minor child as an exemption on his/her federal and state tax returns. The exemption for the third child shall alternate each year. In 2001, the defendant shall claim the two (2) youngest children as exemptions and the plaintiff shall claim the oldest child. In 2002, the plaintiff shall claim the two (2) youngest children and the defendant shall claim the oldest child.
 18. The defendant shall contribute seven thousand five hundred dollars ($7,500) toward the plaintiff's attorney's fees within forty-five (45) days of this Judgment, and the plaintiff shall be responsible for the remaining amount of seven thousand five hundred dollars ($7,500)
 19. Each party shall be equally responsible for CT Page 11398 one-half (1/2) of the orthodontic fees claimed as due and owing to Dr. Montanaro.
 20. Each party shall be responsible for any loans or debts which may be owed to his/her parents and each shall be free and clear of any claims or demands made by the other spouse regarding such monies as may be owed.
 21. Each party shall keep all items of personal property located within the property limits of residences designated to him/her in paragraphs number 10 and 11 above with the exception of the following items from 110 Millbrook Terrace in Monroe, Connecticut, which shall be the sole property of the defendant:
a. five (5) crystal wine goblets;
 b. one-half (1/2) of the family photographs and videos, each to share equally in the cost of the reproduction to be undertaken by the plaintiff;
c. roll top desk;
d. stereo system; and,
e. tractor.
 These items are to be removed from the marital residence within thirty (30) days of this date by arrangement with the plaintiff wife. All other items in that home shall remain the plaintiff's property free of any claims or demands by the defendant.
 22. The parties shall share equally the joint debt owed on the Mastercard credit card (regardless of the issuing bank) and/or Visa credit card listed on his/her current financial affidavit (his of August 1, 2001, and hers of August 6, 2001). All other debts and/or assets listed on such financial affidavits shall be the debt and/or asset of the listing party except as otherwise here addressed by some other provision.
CT Page 11399
SO ORDERED this 22nd day of August, 2001.
SHEEDY, J.